JOURNAL ENTRY and OPINION
Applicant-appellant Thomas Taylor, the owner of a site with petroleum contaminated soil, brought this claim for compensation after he removed a large quantity of that contaminated soil for remediation. The Petroleum Underground Storage Tank Release Board ("board") disallowed nearly all of the claim on grounds that the remediation was unnecessary. Applicant's appeal to the court of common pleas was likewise denied. In this appeal, he questions several of the board's findings, as approved by the court.
A reviewing court may reverse the board's determination only if it is unlawful, unreasonable, or against the manifest weight of the evidence.Tzangas, Plakas Mannos v. Administrator, Ohio Bur. of Emp. Svcs. (1995), 73 Ohio St.3d 694, 696-697, citing Irvine v. State, Unemp. Comp.Bd. of Rev. (1985), 19 Ohio St.3d 15, 482 N.E.2d 587. A board's final decision may not be reversed as against the manifest weight of the evidence if it his supported by some evidence in the record. * * * The fact that reasonable minds might reach different conclusions is not a basis for the reversal of the court's decision." Sindel v. EBCO Mfg.Co., Inc. (1991), 71 Ohio App.3d 426, 429, citing Irvine, supra,19 Ohio St.3d at 18. Our standard of review from a court of common pleas' review of a decision by the board is limited to a determination of whether the court abused its discretion by affirming the board's findings. In reMeyer Senders (1996), 110 Ohio App.3d 199, 203.
The fire marshal is charged with promulgating regulations governing releases of petroleum from underground storage tanks. See R.C.3737.88(E). These regulations establish different levels of contamination and remedial action based on the applicable level. Category One action levels require the most intensive remediation while Category Four levels require the least remediation. See Ohio Adm. Code 1301:7-9-13(I). Site categorization is based on factors relating to the presence and depth of ground water, the site's proximity to potable wells, the geology of the site and man-made or natural conduits for ground water at the site.
Applicant owned an underground storage tank at a site formerly used as a gas station. The site is a Category Three site. In June 1996, five underground storage tanks were removed from the site. At that time, twenty-one soil samples were collected and analyzed. Toluene, ethyl benzene, total xylenes and TPH contamination were each below Category Three action levels; only benzene exceeded a Category Three action level. The Bureau of Underground Storage Tank Regulation ("BUSTR") approved a remedial action plan for corrective action at the site which would bring contamination at the site to below Category Three action levels. This plan, approved by BUSTR, ultimately involved the removal of 3,142.17 tons of petroleum contaminated soil, with new soil back-filled into the excavation. BUSTR issued a "No Further Action" letter for the site in July 1997, in effect finding that the site had been remediated to below Category Three action levels. No underground tanks remained on the site.
Taylor then sold the site to a national drug store chain. In December 1997, an environmental control company supervised the installation of five preliminary test pits preparatory to the installation of proposed storm sewers. Soil samples from the test pits were analyzed and broken into twenty-four different piles. One of the samples produced contaminants in excess of the Category Three action level for benzene and TPH.
BUSTR prepared a suspected release report in February 1998, but found that no emergency existed at the site. Noting that the site had been previously remediated with no further action necessary, BUSTR reopened the site and awaited a report on the petroleum contaminated soil.
BHE Environmental, Inc. oversaw the excavation at the site and stockpiled soil and fill into twenty-four separate piles. Samples from these piles were analyzed at BHE's on-site mobile laboratory. One soil pile produced findings exceeding the Category Three action level for benzene and total petroleum hydrocarbons.
Rite-Aid decided to remove all the contaminated soil and replace it with clean fill. Soil disposal activities were initiated as part of a necessary cost requirement between the applicant and Rite-Aid. Applicant then made the application at issue for costs associated with removing all twenty-four piles of soil — at a total cost of $41,104.76.
BUSTR determined that only one of the soil piles contained contaminants in excess of acceptable levels, and therefore reimbursed Taylor at a rate of 1/24 of his total cost of removing and cleaning the soil. It decided that the remaining levels were all within acceptable limits and that the contaminated soil could have been put back without violating any law.
Taylor appealed the decision. The referee found that Taylor had no legal obligation to remove and clean the soil as the level of petroleum in the soil was within previously determined acceptable limits. The referee found no evidence to show that the removal of the soil was necessary to human health and the environment, and absent such a connection, the costs arising from the remediation of the petroleum contaminated soil did not result from corrective action authorized by either the fire marshal or the applicable statutes.
The referee also found that applicant failed to show a connection between the contamination found at the site in 1998 and the petroleum release discovered in 1996. Consequently, the referee found that applicant's actions were not a "corrective" action as defined by the revised code and administrative regulations.
Finally, the referee found that the excavation of the sewer drain and catch basin were contractual conditions of the sale between applicant and Rite-Aid. Compensation was therefore denied on the basis of Ohio Adm. Code3737-1-09(A)(4)(d).
The board approved these findings.
On appeal to the court of common pleas, applicant argued that his activities fell under the definition of "corrective action;" that the board erred by upholding the referee's decision to exclude telephonic testimony; and that the board erred by adopting the referee's finding that there was no evidence to show that the March 1998 release was related to the prior reimbursable release.
The court upheld the board's decision, finding it to be supported by reliable, probative and substantial evidence, and that the board's decision was in accordance with the law.
 I
Applicant first complains that the court erred by finding the 1998 remediation did not constitute compensable corrective action under regulations. He maintains that his remediation not only fell under the definition of "corrective action" but was required under the applicable corrective action regulations.
The public policy supporting the formation of the board and matters associated with underground storage tank releases is, among other stated objectives, to "preserve and protect the water resources of the state" and to protect and preserve the public health, safety, convenience and welfare. See R.C. 3737.94(A).
A person seeking reimbursement from the fund must submit a claim and meet the following three criteria: (1) the applicant must establish eligibility; (2) the corrective action performed must have been authorized by the fire marshal under R.C. 3737.882; and (3) the costs of performing the corrective action must be necessary to comply with the fire marshal's rules governing corrective actions. See R.C. 3737.92(B).
The term "corrective action," as applicable in this appeal, is defined in both R.C. 3737.87(B) and Ohio Adm. Code 1301:7-9-02(B)(9) as:
 * * * any action necessary to protect human health and the environment in the event of a release of petroleum into the environment, including, without limitation, any action necessary to monitor, assess, and evaluate the release. ***
The court did not abuse its discretion by affirming the board's decision that no corrective action was required of applicant because the petroleum found at the site did not require action to "protect human health and the environment."
The category rating system used by the fire marshal presupposes that each level within the site scoring system will have a certain degree of contamination, with the level of contamination falling within defined parameters for a particular site. The degree of remediation required depends on the categorization of the site, and the referee correctly determined that corrective action must, as used in its normal sense, connote a need for correction based on the site scoring system established by the fire marshal.
Applicant remediated petroleum contaminated soil that did not exceed applicable limits for the site. The referee heard testimony from the former project manager for BHE Environmental, who testified that when the soil was removed in 1998, there was no requirement based on the categorization of the site that the soil be removed and no requirement that excavation occur at the site. We consider this competent evidence to show that applicant's remediation did not constitute "corrective action."
Applicant also maintains that the removal of the petroleum contaminated soil constituted "corrective action" by virtue of reference in the statutory definition of "the residual effects of contamination after the initial corrective action is taken." He claims that the 1998 contamination must have been related to the 1996 release and remediation, and that BUSTR's decision to re-open the 1996 incident necessarily meant that contamination subsequently found on the site constituted a residual effect from the prior release.
The referee considered this issue and found that applicant failed to show by a preponderance of the evidence a connection between the release occurring in 1996 and petroleum found on the site in 1998. This is an important factual finding and we are obligated to give it a great deal of deference. Our review of the record shows support for this factual finding, inasmuch as the 1998 levels did not exceed the levels present in 1996 following the approval of the remedial action plan. In other words, with one exception which is not at issue in this appeal, the levels of petroleum contaminated soil found in 1998 did not exceed those applicable to the site under the site scoring system, so the presence of petroleum in the soil could not be said to be a "residual effect" of the 1996 release.
Moreover, we believe applicant assigns too much importance to BUSTR's decision to reopen the site. We agree with the referee that there was no evidence that BUSTR's decision to re-open the 1996 remedial action plan demonstrated its conclusion that the 1998 incident was related to the 1996 release. The decision to re-open the site was an administrative procedure that invoked BUSTR's jurisdiction over the matter. It would be a violation of regulations for BUSTR to reimpose a remedial action plan adopted two years earlier for an unrelated spill. BUSTR still had to assess the 1998 situation and approve a plan for that specific incident.
But even if we were to accept the argument that re-opening the action plan implemented the 1996 remediation protocol contained in that plan, it does not follow that applicant had BUSTR's permission to remediate contamination to levels beyond that initially approved by the fire marshal. This was a Category Three site, and only one of the soil samples exceeded Category Three limits. Remediation plans are only intended to remedy conditions to their authorized category levels — complete remediation is not the goal. A representative of BHE Environmental testified that he knew twenty-three of the soil samples did not exceed applicable limits for contamination and could have been replaced in the ground. Remediation of all but one soil sample was unnecessary and can only be considered to have been undertaken gratuitously.
We hold that remediation above and beyond category levels is not corrective action as defined in R.C. 3737.87(B) and the court did not err by affirming the board's decision to deny compensation.
Applicant also argues that a denial of the right to participate in the fund is against public policy because it discourages private development of land. This argument arose at the trial court level, apparently when the board argued that applicant had not been forced to develop the property and must incur the cost of remediation. This argument was not raised before the referee, and formed no part of the referee's conclusions of law. We do not believe this point is essential for resolution of this case and follow long-standing principles of appellate procedure that preclude us from considering issues not raised below. Stateex rel. Quarto Mining Co. v. Foreman (1997), 79 Ohio St.3d 78, 81.
 II
Applicant also maintains the referee erred by excluding the testimony of a representative employed by BUSTR. Applicant maintains this witness would have testified that BUSTR did approve the 1998 remediation of petroleum contaminated soil. Although neither party objected to the witness testifying by telephone, the referee believed that even if the witness had testified that he authorized the removal of petroleum contaminated soil, that authorization would not overcome the legislative requirement that removal of petroleum constitutes corrective action.
Although a hearing officer presiding over an administrative hearing has wide discretion to decide what kind of evidence should be permitted, the hearing officer cannot exercise that discretion in an arbitrary manner.Haley v. Ohio State Dental Board (1983), 7 Ohio St.3d 1, 6.
The court did not err by affirming the referee's refusal to permit the BUSTR representative to testify. The referee correctly concluded that even had the BUSTR representative testified that he authorized the removal of petroleum contaminated soil, that authorization would not amount to an administrative finding that the removal of that soil was corrective action under R.C. 3737.92(B). Applicant still had to prove that removal of the petroleum contaminated soil was necessary to protect human health and the environment. He could not do this. The soil he removed did not have to be removed at all because it did not exceed applicable action levels. It could have been back-filled into the excavation without creating any violation. So the BUSTR representative's testimony would not have been relevant to proving whether the removal of the petroleum contaminated soil constituted remedial action.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.